NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
VICTOR A. RODGERS (Cal. Bar No. 101281)
Assistant United States Attorney
Asset Forfeiture Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2569
    Facsimile: (213) 894-0142
    E-mail: Victor.Rodgers@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>           v.<br><br>$417,235.00 IN U.S. CURRENCY,<br><br>        Defendant. | Case No. 2:18-CV-07946<br><br>COMPLAINT FOR FORFEITURE<br><br>18 U.S.C. § 981(a)(1)(A) and (C)<br>and 21 U.S.C. § 881(a)(6)<br><br>[ICE] |

Plaintiff United States of America brings this claim against the defendant $417,235.00 in U.S. Currency, and alleges as follows:

JURISDICTION AND VENUE

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C) and 21 U.S.C. § 881(a)(6).

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

PERSONS AND ENTITIES

4. The plaintiff in this action is the United States of America (the "government").

5. The defendant in this action is $417,235.00 in U.S. Currency (the "defendant currency") seized by law enforcement officers on or about April 27, 2017, which funds consist of $198,135.00 in U.S. Currency seized from a Honda Accord operated by Crystl Bernal Lopez and parked in a parking lot at the intersection of Atlantic Avenue and Pendleton Avenue in Lynwood, California and $219,100 seized from Mariela Gastelum Payan's South Gate, California residence.[1]

6. The defendant currency is currently in the custody of Customs and Border Protection in this District, where it shall remain subject to the jurisdiction of this Court during the pendency of this action.

7. The interests of Mariela Gastelum Payan and Crystl Bernal Lopez may be adversely affected by these proceedings.

FACTS SUPPORTING FORFEITURE

Background Of The Investigation

8. Law enforcement officers conducted an investigation into a drug trafficking and money laundering organization operating between Southern California and Mexico. As a result of the investigation, officers determined that persons involved in the illegal drug

---

[1] Pursuant to Local Rule 5.2-1, only the city and state of residence addresses are set forth in this Complaint.

trafficking activities included someone known as Trak (also known as Accion and Audio) and Hernan Gastelum Payan (also known as Black), both of whom are Spanish speaking male adults who served as narcotic sources of supply operating within Mexico and who coordinated the transportation of narcotics into the United States and the delivery of narcotic proceeds into Mexico.

9. Hernan Gastelum Payan, who is the brother of Mariela Gastelum Payan, has an extensive drug trafficking criminal history, which includes a federal conviction for possession with intent to distribute kilogram quantities of cocaine. See <u>United States of America v. Agustin Aguirre-Ramirez, et al.</u>, District of Colorado Case No. CR 12-00038-CMA and was released from prison on or about October 30, 2015 on his sentence. In addition, Hernan Gastelum Payan has a 2006 state law conviction for possession with intent to sale narcotics. After leaving federal custody in 2015, and as more fully reflected below, Hernan Gastelum Payan, who is also known as Black, discussed the illegal narcotic trafficking activities in the BlackBerry messages set forth below, which reflect that the defendant currency constitutes traceable proceeds of narcotics trafficking or was involved in narcotic trafficking, rendering the funds subject to forfeiture to the government.

<u>April and May 2017 BlackBerry Drug Trafficking Communications By Hernan Gastelum Payan Using The Name "Black"</u>

<u>BlackBerry Communications Potentially Unrelated To The Defendant Currency</u>

10. Based upon information from the BlackBerry used by Black, on April 5, 2017, officers learned that an unknown subject using a specific telephone number in the 562 area code would be receiving an

unspecified amount of narcotics.  Officers located the user of the telephone number, and contacted that user at the user's Long Beach, California residence after the user arrived at that location in the user's vehicle.  When officers looked inside the vehicle, officers found and seized eight kilograms of cocaine from a bag inside the vehicle's passenger compartment.  In addition, officers seized four kilograms of cocaine from the bathroom of the residence.

  11.  During a BlackBerry message conversation between Trak and Black starting at approximately 5:36 p.m. on April 12, 2017, Trak asked if Gordo could deliver 2 in the morning.  Black said okay and for him to give him the information.  Trak said okay.  Black said that way he would tell him not to go to work.  Trak said he would give him the information.  Black said okay.  Trak sent the following "Trp rat rtre" and said with letters on behalf of Gavino.  Trak told him to try and call him with a new cell so everything could be new from the cell here.  Trak said everything with the first R.  Black said okay.

  12.  Based upon officers' interpretation of the BlackBerry conversation in the preceding paragraph, Trak and Black are facilitating the delivery of 2 kilograms of cocaine.  Trak asked if Gordo (the drug trafficking organization stash house operator) could deliver 2 (kilograms of cocaine) in the morning.  Black said okay for him to give him the information (telephone number).  Trak said okay.  Black stated that he (Gordo) would tell him not to go to work.  Trak stated he would give him the information.  Black stated okay.  Trak sent the following: Trp rat rtre (which is a code for a telephone number in the 323 area code) and said with letters on behalf of Gavino.  Trak told him to try and call him with a new cell so

everything could be new from the call here. Track stated everything with the first R. Black stated okay.

13. During a BlackBerry message conversation between Trak and Black on April 19, 2017, Trak provided a telephone number with a 623 area code to Black to facilitate the delivery of 2 kilograms of cocaine for a narcotic customer called Juez.

<u>BlackBerry Communications And Activities Pertaining To</u>
<u>The April 27, 2017 Seizure Of The Defendant Currency</u>

14. During a BlackBerry message conversation between Trak and Black starting at approximately 10:28 a.m. on April 22, 2017, Black stated he was going to send the old man with Piñata since it was ready. Black asked if Trak had a six. Trak stated he didn't have anything because he delivered everything yesterday, but during the week he would get some in. Black acknowledged and asked if he should still send him like that or if he should wait. Trak said go ahead and send it without any so they could start from 0. Black acknowledged. Trak said he had another "carton" with Pancho and next week when he would go up, he could bring it down to him. Trak said other option would be for him to go for his today and then during the week he could go for the one of Piñata. Black acknowledged and asked Trak where and how much it would be given so he can tell him. Trak said it would be with Pancho and it would be about 200. Black said that would be fine but they should let him arrive to a location so he could arrange it. Trak acknowledged.

15. Based upon officers' interpretation of the above conversation:

    a. Trak and Black are discussing the transportation of $200,000 in illicit narcotic proceeds from the United States to

Mexico.  Black said he was going to send the old man (unidentified Drug Trafficking Organization courier) with Piñata since it (illicit narcotic proceeds) was ready.  Black asked if Trak had a six (kilograms of cocaine).  Trak stated he didn't have anything because he (Trak) delivered everything yesterday, but during the week he would get some (kilograms of cocaine) in.  Black acknowledged and asked if he (Black) should still send him (Drug Trafficking Organization courier into the United States) like that or if he (Black) should wait.  Trak stated to go ahead and send it without any (Drug Trafficking Organization courier vehicle unloaded) so they could start from 0 (verify courier vehicle is clean during crossing).  Black acknowledged.

   b. Trak stated he had another "carton" (illicit narcotic proceeds) with Pancho and next week when he (Drug Trafficking Organization courier) would go up (cross into the United States), he could bring it (illicit narcotic proceeds) down to him (Trak).  Trak stated other option would be for him (Drug Trafficking Organization courier) to go to his (Trak's) today and then during the week he could go for the one of Piñata (illicit narcotic proceeds).  Black acknowledged and asked Trak where and how much it would be given so he can tell him (Drug Trafficking Organization courier).  Trak said it would be with Pancho and it would be about 200 ($200,000 United States Currency).  Black stated that would be fine but they should let him (Drug Trafficking Organization courier) arrive to a location so he could arrange it (illicit narcotics proceeds).  Trak acknowledged.

  16. During a BlackBerry message conversation between Trak and Black starting at approximately 6:35 p.m. on April 23, 2017, Trak

asked if Black knew anything in regards to the old man.  Black said the old man arrived with the "piñata" and he (old man) was on his way back.  Black said he (old man) would go with Pancho tomorrow because he (Black) told him (old man) that they would take care of him (old man) on Monday.  Black told Trak that he (old man) would head back early tomorrow.  Black asked what time was the "cena" (lit.dinner/ meet).

17.   During a BlackBerry message conversation between Trak and Black starting at approximately 12:20 p.m. on April 24, 2017, Trak provided Black with number in the 664 area code (a new Mexican number) and said with El Perro.  Black acknowledged.

18.   During a BlackBerry message conversation between Trak and Black starting at approximately 5:38 p.m. on April 24, 2017, Trak said they were there.  Black said the old man said he did not want to go out with that (200,000) outside because it was a lot and he (old man) did not want to risk the "carton" (money).  Black asked if he should pick him up or what they should do.  Trak told him to pick him (old man) up and he (Trak) would pick him (old man) up.

19.   During a BlackBerry message conversation between Trak and Black starting at approximately 5:40 p.m. on April 24, 2017, Trak asked if it was with Gordo.  Black said he would let him know.  Black said it was not another place.  Trak said okay.

20.   During a BlackBerry message conversation between Trak and Black starting at approximately 7:19 p.m. on April 24, 2017, Black said it was ready and the old man was resting and everything was fine that way Trak could pick them (200) up tomorrow.  Trak said okay.  Black said okay.

/ / /

21. During a BlackBerry message conversation between Trak and Black starting at approximately 7:40 p.m. on April 24, 2017, Black said he had not slept because he was worried about the thing with the old man. Black said they might continue. Trak said not anymore today.

22. During a BlackBerry message conversation between Trak and Black starting at approximately 8:48 a.m. on April 26, 2017, Trak told Black he wanted to pick up the "carton" (money). Black said yes, and said he would send the information. Trak told Black to let him know how much it was for Piñata's. Black said yes, and said he would send the complete information. Black told Trak to wait since the friend was going to get a new one (phone number). Trak told Black to make sure the day did not go to waste. Black said no, he wanted that (money) to be picked up today. Black told Trak to tell the person to start getting close if it was the same person since he (person) already knew where. Trak said no, it was not the same person. Black said okay, and told Trak to wait until he (friend) gave him the information.

23. During a BlackBerry message conversation between Trak and Black starting at approximately 10:41 a.m. on April 26, 2017, Black provided the following: Prp-rcp-htra (which is a code for telephone number 323-203-8621, which was a new Cingular telephone number) and said with Mauro. Trak told Black to send him the amount. Black said it was 210 but there was some missing. Black said he was calling Piñata because there was some missing and he (Black) wanted him (Piñatas) to tell him the amount.

24. Based upon officers' interpretation of the two preceding paragraphs, Black provided the telephone number 323-203-8621 to Trak

1 for an unidentified Drug Trafficking Organization member Mauro to
2 facilitate the delivery of $210,000 in illicit narcotics proceeds.
3    25.   During a BlackBerry message conversation between Trak and
4 Black starting at approximately 11:07 a.m. on April 26, 2017, Trak
5 told Black to let him know once Black had the exact amount.  Trak
6 told Black to check why there was missing some.  Black said he was
7 trying to get a hold of him (Piñatas) but he was not answering. Black
8 said he (Black) called his (Piñatas') brother so he (brother) could
9 check. Black told Trak to tell the guy to call Mauro so they (Mauro
10 and guy) could make arrangements because he (Mauro) was going to go
11 out.
12    26.   During a BlackBerry message conversation between Trak and
13 Black starting at approximately 11:44 a.m. on April 26, 2017, Trak
14 asked how much he (Piñatas) had.  Trak asked if it was 210 plus what
15 Pancho (had sent) for him (Trak).  Black said yes, and said he did
16 not know how much it was Pancho's.  Black said he told him (Mauro) to
17 leave it the same way he (Mauro) had received it (money). Trak said
18 okay, and said he did know how much his (Trak's) was.  Trak asked if
19 it was 210 from Piñata.  Black said yes, and said he (Piñata) had
20 sent that.  Black said he was going to deliver that (210).  Trak told
21 Black to let him (Trak) know once Black located him (Piñata).  Black
22 said he (Piñata) was at an auction and he (Piñata) was not answering
23 but everything was fine.  Black said he was going to deliver the 210
24 he (Piñata) had given and would talk to him (Piñata) later to see
25 what was going on.  Trak said okay.  Black told Trak to let him know
26 if Trak had any (narcotics) over there (in the United States).  Trak
27 said yes, and said he would have some (narcotics) during the week
28

Black said he would let Trak know once the "carton" (money) was done.

27. During a BlackBerry message conversation between Trak and Black starting at approximately 1:11 p.m. on April 26, 2017, Trak said they (Mauro and others) would go for the "carton" (money) tomorrow. Trak told Black to give him (Devil Anse's guy) what was for Panchos and the day after tomorrow what was for Piñatas. Trak said that way they would not take all out at once.

28. During a BlackBerry message conversation between Trak and Black starting at approximately 2:17 p.m. on April 26, 2017, Black said that was fine. Black said he had the cell in the car.

29. During a BlackBerry message conversation between Trak and Black starting at approximately 2:57 p.m. on April 26, 2017, Trak told Black not to give everything. Black said it would get done the way that Trak had said it. Trak said alright.

30. During a BlackBerry message conversation between Trak and Black starting at approximately 10:32 a.m. on April 27, 2017, Trak told Black a lady[2] had answered to the phone number Black had provided. Black said it did not matter. Trak said they (possibly Mauro and TRAK's people) had made arrangements and asked Black to check. Black said yes, and said he (Black) was notified that they (possibly Mauro and Trak's people) had talked already. Trak said okay. Black said they (Trak's people) were supposed to go early. Trak said yes, they (Trak's people) were almost there. Black

---

[2] As mentioned in the next paragraph, officers seized approximately $200,000.00, which is part of the defendant currency, from a female courier approximately two hours after the Trak-Black 10:32 a.m. BlackBerry communications started, by locating an individual as a result of situs data obtained from the 323-203-8621 telephone number (mentioned above) provided by Black to Trak.

said he would let Trak know once they (possibly Mauro and Trak's people) met.

31.  As mentioned above, during a BlackBerry message conversation between Trak and Black starting at approximately 10:41 a.m. on April 26, 2017, Black provided the following: Prp-rcp-htra (which is a code for telephone number 323-203-8621, which was a new Cingular telephone number).  Using situs data obtained as a result of that telephone number, officers established surveillance at a South Gate, California residence and, at approximately 12:30 p.m. on April 27, 2017 - - i.e., about two hours after the Blackberry message set forth in the preceding paragraph - - officers saw an individual, who was later identified as Mariela Gastelum Payan and is the sister of Hernan Gastelum Payan (also known as "Black") - - leave the South Gate, California residence carrying a backpack, enter a Chevrolet Tahoe vehicle, and drive away.  Officers followed Mariela Gastelum Payan to a parking lot at the intersection of Atlantic Avenue and Pendleton Avenue in Lynwood, California, and park near a Honda Accord.  The trunk of the Honda Accord opened and a female, who was later identified as Crystl Bernal Lopez, exited the Honda Accord. Mariela Gastelum Payan exited the Chevrolet Tahoe carrying the backpack, handed the backpack to Lopez, and Lopez placed the backpack into the Honda Accord's trunk.

32.  Officers approached and made contact with Lopez and Mariela Gastelum Payan.  A trained and state-certified narcotic detection canine[3] positively alerted to the Honda Accord's open trunk,

---

[3] As of the time of the alert, the canine had received hundreds of hours of training in the detection of narcotics (including cocaine, methamphetamine, heroin and marijuana) for which the canine

signifying that the trunk's contents (i.e., the money within the backpack) had recently been in close proximity to narcotics as of the time of the alert.

33. After telling Lopez that the canine had alerted, officers asked Lopez whether there was anything illegal in the trunk of Lopez's vehicle. In response, Lopez stated that there was a black bag containing approximately $200,000.00 that had been handed to her (Lopez) by a female. When officers asked Lopez whether Lopez knew the lady that had handed Lopez the bag with money, Lopez replied no. In addition, Lopez stated that she (Lopez) resided in Mexico, that the money was not hers (Lopez's) and that she (Lopez) did not know to whom the funds belonged. Lopez signed a disclaimer of ownership form as to the funds.

34. Officers found a total of $198,135.00 in U.S. Currency (i.e., part of the defendant currency) inside the bag situated in the trunk of Lopez's Honda Accord. In addition to the canine alert and the BlackBerry messages reflecting the connection of the funds to illegal drug trafficking and money laundering, the funds bore additional indicia of drug trafficking, including that the funds were bundled, rubber-banded, wrapped in plastic and in mixed denominations consistent with drug trafficking. As to the currency denominations,

---

is trained (including training which has occurred after the canine's initial certification in PUT IN YEAR), and the canine alerts to the scent of narcotics for which the canine is trained. The canine's training has included routinely checking both circulated and uncirculated United States currency and the canine does not alert to uncirculated currency, in order to ensure that the canine does not alert to the actual odor of currency itself but instead to the odor of controlled substances on the currency. The canine's most recent re-certification was on January 9, 2017. Since the canine's initial certification, the canine has been responsible for the location and seizure of narcotics for which the canine is trained and narcotic proceeds.

the $198,135.00 consisted of 115 one dollar bills, 288 five dollar bills, 333 ten dollar bills, 4,505 twenty dollar bills, 171 fifty dollar bills and 946 one hundred dollar bills.

35. When officers spoke with Mariela Gastelum Payan while at the parking lot location, Mariela Gastelum Payan told officers that there was more money situated at her residence (i.e., the location where offices had earlier that day at approximately 12:30 p.m. seen Mariela Gastelum Payan exit carrying the backpack from which the approximately $200,000.00 in U.S. currency was seized). Officers accompanied Mariela Gastelum Payan to her South Gate, California residence and, while there, Mariela Gastelum Payan admitted to officers that she (Mariela Gastelum Payan) was in possession of an unknown quantity of currency. In addition, Mariela Gastelum Payan told officers to search the master bedroom, which she claimed was hers and that no one else either occupied or kept belongings. Mariela Gastelum Payan told officers there was an unknown quantity of currency within a cardboard box in the master bedroom.

36. Inside a Kirkland Signature Baby Wipes cardboard box in the bedroom on the floor officers found $193,500.00 of the defendant currency, consisting of nine bundles of currency wrapped in green plastic and labeled with the number 20 (i.e., 20,000 x 9 = $180,000) while one bundle of currency was wrapped in plastic and labeled with the number 13 5 (i.e., 13,500, and $13,500 + $180,000 = $193,500.00). In addition to the bundling and wrapping, the $193,500.00 bore other narcotic related indicia, including that the funds were in narcotic trafficking consistent denominations, consisting of 480 one dollar bills, 1,222 five dollar bills, 595 ten dollar bills, 7,953 twenty dollar bills, 72 fifty dollar bills and 183 one hundred dollar bills.

37. In addition, after Mariela Gastelum Payan told officers that there was additional money hidden in the bedroom in the bottom drawer of a nightstand and in a purse situated in the master bedroom closet, officers found additional currency at those locations. From the night stand drawer, officers found an additional $11,000.00 (i.e., part of the defendant currency) hidden between clothing, which funds bore narcotic-related indicia in that the funds were rubber-banded, stacked and bundled. In addition, officers found the remaining $14,600.00 in defendant currency, which was rubber-banded and bundled, hidden inside a black sock situated in a Louis Vuitton purse that officers found in the master bedroom closet.

38. Officers showed Mariela Gastelum Payan the money officers had recovered from the backpack situated in Lopez's Honda Accord's trunk ($198,135.00) and the cardboard box situated in Mariela Gastelum Payan's bedroom ($193,500.00). Mariela Gastelum Payan told officers that those funds did not belong to her, she did not know who owned those funds, officers could take those funds and she did not want those funds back. In addition, Mariela Gastelum Payan signed a disclaimer of ownership form disclaiming any ownership interest in and relinquishing, abandoning and waiving her rights to contest forfeiture of those funds, which total $391,635.00 of the defendant $417,235.00 in U.S. Currency. Also, Mariela Gastelum Payan told officers that she had been transporting the money as a favor. As to the remainder of the funds (i.e., the $11,000.00 found in the nightstand drawer and $14,600.00 found in the purse), Mariela Gastelum Payan claimed that the monies were hers, but Mariela Gastelum Payan could not provide any explanation why those funds were packaged like the funds she had disclaimed or officers with her tax

14

returns to show that her income was sufficient to justify her acquisition or possession of those funds.

39.  While at the Mariela Gastelum Payan residence, officers also spoke with Mariela Gastelum Payan's mother, Rosalva Payan, who stated that she had arrived from Sinaloa, Mexico the previous evening, and Maria Gastelum Payan's housekeeper, Maura Melendres Rojo.  Both women denied knowledge or ownership of the seized currency, and signed forms disclaiming ownership of the funds.

40.  The additional April 27, 2017 BlackBerry messages between Trak and Black (i.e., Mariela Gastelum Payan's brother Hernan Gastelum Payan) set forth below also show the relationship of the defendant currency to drug trafficking.  During a BlackBerry message conversation between Trak and Black starting at approximately 2:10 p.m. on April 27, 2017:

a.  Trak said the girl (the transporter Lopez) got busted and was taken.  Trak asked where Black was.  Black acknowledged.  Trak told Black to get rid of the other part (money) right away.  Trak said Black's girl showed up and said the "carton" (money) was in the trunk then the "gob" (government or law enforcement) showed up.  Trak said she (transporter) did not give anything.  Trak asked what Black had found out.  Black said they were not answering and someone was on their way there.  Trak said it was weird and asked if Black used the same cell.  Black said he bought one of the small ones for that and she (Black's runner) also bought a new one.

b.  Trak asked which "carton" (money) she moved.  Black said the woman arrived to Black's sister's (Mariela Gastelum Payan's) house and it was full of law enforcement.  Trak told Black to let him

know. Trak said it went to hell. Black said nobody had been arrested before, even when they had "jale" (work/narcotics), so it was weird that she (transporter) was, even when it was just cash. Trak said it was weird.

   c. Black said they (law enforcement) were at the house searching everything. Trak said hopefully they did not find the other ones (money). Black said she (Black's runner) had it (money) there. Black said he sent Vector to go see. Trak said they (law enforcement) must have seen when the old man (a courier) arrived. Black said he did not think they (law enforcement) would have waited. Black asked what they told the girl that went to pick up. Trak said they (law enforcement) just told her to sign a paper.

  41. BlackBerry messages after April 27, 2018 further identify Mariela Gastelum Payan's brother Hernan Gastelum Payan as Black and therefore tie the defendant currency to drug trafficking. During a BlackBerry message conversation between Trak and Black starting at approximately 12:25 p.m. on April 28, 2017, Black said he was in Isla, and said he was changing the numbers. Trak asked if Black could go over the office. Black asked yes, and asked Trak to tell him where at. Trak said to the business place. Black said he would get over there as soon as he would finish that. Trak acknowledged.

  42. During a BlackBerry message conversation between Santo and Black starting at approximately 11:39 a.m. on May 5, 2017, Santo told Black he (Santo) was on his way. Black asked at what time he (Santo) would arrive and asked if he (Black) should pick him (Santo) up. Santo said yes, and said he was departing from "la tia" (Tijuana, Mexico) at 1:00 p.m. Black said okay, and said he would be there (at the airport) at 4:00 p.m. Santo said okay.

43. During a BlackBerry message conversation between Santo and Black starting at approximately 12:27 p.m. on May 5, 2017, Santo told Black he was on the "toro" (bull/possibly airplane). Black said that was great. Santo told Black they (law enforcement) were checking on the way out (in Tijuana). Black asked if Santo was empty handed. Santo said yes, and asked Black to send his name so they (third parties) could send (money). Black sent the following name: Hernan Gastelum Payan.

Mariela Gastelum Payan's False Administrative Claim

44. Pursuant to an administrative claim dated June 5, 2017 submitted in the administrative forfeiture proceedings that often precede judicial forfeiture actions, Mariela Gastelum Payan submitted a claim to contest the forfeiture of the defendant currency. In that claim, Mariela Gastelum Payan falsely stated under oath that she had an ownership interest in the $417,235.00 in defendant currency, notwithstanding the fact that she told officers on April 27, 2017 that she owned only $25,600.00 of those funds (i.e., $11,000.00 found in the nightstand drawer and $14,600.00 found in the black sock in the Louis Vuitton purse).

FIRST CLAIM FOR RELIEF

45. Plaintiff incorporates the allegations of paragraphs 1-44 above as though fully set forth herein.

46. Based on the above, plaintiff alleges that the defendant currency represents or is traceable to proceeds of illegal narcotic trafficking, was intended to be used in one or more exchanges for a controlled substance or listed chemical, or was used or intended to be used to facilitate a controlled substance or listed chemical violation, in violation of 21 U.S.C. § 841 et seq. The defendant

17

currency is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

### SECOND CLAIM FOR RELIEF

47. Plaintiff incorporates the allegations of paragraphs 1-44 above as though fully set forth herein.

48. Based on the above, plaintiff alleges that the defendant currency constitutes or is derived from proceeds traceable to a controlled substance violation, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D). The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### THIRD CLAIM FOR RELIEF

49. Plaintiff incorporates the allegations of paragraphs 1-44 above as though fully set forth herein.

50. Based on the above, plaintiff alleges that the defendant currency constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i) or (a)(1)(B)(i), or property traceable to such property, with the specified unlawful activity being a controlled substance or listed chemical violation. The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### FOURTH CLAIM FOR RELIEF

51. Plaintiff incorporates the allegations of paragraphs 1-44 above as though fully set forth herein.

52. Based on the above, plaintiff alleges that the defendant currency constitutes property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1957(a), or property traceable to such property, with the specified unlawful

activity being a controlled substance or listed chemical violation. The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

    WHEREFORE, plaintiff United States of America prays:

    (a)   that due process issue to enforce the forfeiture of the defendant currency;

    (b)   that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

    (c)   that this Court decree forfeiture of the defendant currency to the United States of America for disposition according to law; and

    (d)   for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: September 13, 2018

NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

_/s/ Victor A. Rodgers_
VICTOR A. RODGERS
Assistant United States Attorney
Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

VERIFICATION

I, Raul Fernandez, Jr., declare and say that:

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations.

2. I have read the attached Verified Complaint for Forfeiture and know the contents thereof.

3. The information contained in the Complaint is either known to me personally, was furnished to me by official government sources, or obtained pursuant to subpoena. I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 4 day of September 2018 at Los Angeles, California.

_____
RAUL FERNANDEZ, JR.
Special Agent - HSI